| | |
|---|---|
| Janet Smith, Debra Thorne, Sonja Lindley and Pamela Kaberline, on behalf of themselves and all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | |
| U.S. Bancorp, the Employee Benefits Committee and John/Jane Does 1-5, | |
| Defendant. | |

Plaintiffs Janet Smith, Debra Thorne, Sonja Lindley and Pamela Kaberline, by and through their attorneys, on behalf of themselves and all others similarly situated, based on personal knowledge with respect to their own circumstances and based upon information and belief pursuant to the investigation of their counsel as to all other allegations, allege the following.

## INTRODUCTION

1.     This is a class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), concerning the unreasonable, excessive reductions to the pension benefits that Plaintiffs earned under the U.S. Bank Pension Plan's (the "Plan") final average pay formula when they retired before age 65.

2.     The Plan is the combination of numerous defined benefit plans sponsored by U.S. Bank and its predecessors, some of which used different formulae to calculate the

accrual of benefits. Beginning in 2002 for most, and by 2003 for all, participants began accruing benefits under a new final average pay formula ("Final Average Pay Formula").

3.     The Plan's normal retirement age is 65, and the Plan's normal retirement benefit assumes retirement at that age. Participants who accrued benefits under the Final Average Pay Formula can retire as early as age 55. When a participant retires before age 65, the participant's benefits are reduced by a prescribed early commencement factor ("ECF"), which represents the percentage of that participant's normal retirement benefit that the participant will receive when retiring early. For example, an ECF of .90 means that participants receive 90% of the normal retirement benefit they would have been entitled to at age 65.

4.     ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that an early retirement benefit must be actuarially equivalent to the normal retirement benefit the participant would receive at age 65 under the terms of the plan based on reasonable actuarial assumptions about future interest rates and life expectancies.

5.     The ECFs applicable to the Final Average Pay Formula egregiously violate this requirement. They are unreasonable, excessive and incongruent with the interest rates and life expectancies that existed throughout the Class Period. For example, the ECFs improperly reduce participants' retirement benefits by as much as *22 percent* compared to the current actuarial assumptions that the Plan uses to calculate the "actuarial equivalent" of *other benefits* and by as much as *32 percent* compared to the ECFs that apply to the Plan's other benefit accrual formulae.

6.     By reducing Plaintiffs' benefits in greater amounts than are actuarially reasonable to account for Plaintiffs' retirements before age 65, Defendants caused Plaintiffs to forfeit part of their vested retirement benefits in violation of ERISA Sections 203 and 204, 29 U.S.C. §§ 1053 and 204.

7.     Plaintiffs accordingly seek an order from the Court reforming the Plan to conform to ERISA, payment of future benefits under the terms of the reformed Plan and as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

9.     This Court has personal jurisdiction over Defendant, U.S. Bancorp, because it is headquartered and transacts business in, or resides in, and has significant contacts with, this District, and because ERISA provides for nationwide service of process.

10.     This Court has personal jurisdiction over the Benefits Administration Committee (the "Committee") because it is headquartered and transacts business in, or resides in, and has significant contacts with, this District, and because ERISA provides for nationwide service of process.

11.     This Court has personal jurisdiction over the individual members of the Committee because, upon information and belief, each transacts business in, or resides in,

and has significant contacts with, this District, and because ERISA provides for nationwide service of process.

12. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

**Plaintiffs**

13. Plaintiff Janet Smith is a resident of Medford, Oregon. She worked for U.S. Bank or its predecessors from June, 1973 until December, 2013 and accrued benefits under the Final Average Pay Formula from January 1, 2002 until her retirement. She started receiving her pension benefits at age 59.

14. Plaintiff Debra Thorne is a resident of Crystal, Minnesota. She worked for U.S. Bank or its predecessors from September, 1985 until May, 1993, and then again from April, 1999 until September, 2018 and accrued benefits under the Final Average Pay Formula from January 1, 2002 until her retirement. She started receiving her pension benefits at age 62 years, 11 months.

15. Plaintiff Pamela Kaberline is a resident of Troy, Illinois. She worked for U.S. Bank or its predecessors from March, 1999 until January, 2017 and accrued benefits

under the Final Average Pay Formula from January 1, 2003 until her retirement. She started receiving her pension benefits at age 61 years, 2 months.

16.     Plaintiff Sonja Lindley is a resident of Aloha, Oregon. She worked for U.S. Bank or its predecessors from 1989 until December, 2013 and accrued benefits under the Final Average Pay Formula from January 1, 2002 until her retirement. She started receiving her pension benefits at age 56 years, 5 months.

**Defendants**

17.     Defendant U.S. Bancorp is a financial services company headquartered in Minneapolis, Minnesota that provides a full range of financial services, including lending and depository services, cash management, capital markets services, investment management, credit card services and mortgage banking. U.S. Bancorp's banking subsidiary is U.S. Bank, National Association, which has over $357 billion in deposits. U.S. Bank appoints the Committee. *See* 2017 SPD at 18.

18.     The Committee is an unincorporated association with a principal place of business in Robbinsdale, Minnesota. The Committee is the Plan's administrator and a named fiduciary under ERISA. *See* 2002 Plan Restatement at §§ 12.6, 12.7.

19.     John/Jane Does 1 through 5, inclusive, are the individual members of the Committee, or any other committee(s) responsible for administering the Plans. Their names and identities are not currently known.

## APPLICABLE STATUTES AND REGULATIONS

20.     In a defined benefit plan, a participant's "accrued benefit" as an "an individual's accrued benefit under the plan and, except as provided in (ERISA §

204(c)(3), expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

21.     ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if a participant's accrued benefit is determined before the plan's normal retirement age, it "shall be the actuarial equivalent" of the benefit that the participant would receive at the plan's normal retirement age. *See also* 26 U.S.C. § 411(c)(3).

22.     The Treasury's regulations that construe I.R.C. § 411(c)(3), states that the "actuarial equivalence" of the participant's accrued benefit "as determined by the Commissioner." 26 C.F.R. § 1.411(c)-1(e).

23.     Section 203(a) of ERISA, 29 U.S.C. § 1053(a), provides that an employee's right to his or her vested retirement benefits is non-forfeitable. The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**I.     The Plan.**

**A.     General Provisions.**

24.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A).

25.     The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

26.     The Plan covers eligible employees of U.S. Bancorp and its subsidiaries. U.S. Bancorp is the Plan's sponsor. The Committee is Plan's administrator under ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). *See* 2002 Plan Restatement at § 12.6.

27.     The Plan is the result of the merger on January 1, 2002 of the U.S. Bancorp Cash Balance Pension Plan (the "Old Cash Balance Plan") and the Firstar Corporation Employees Pension Plan (the "Firstar Plan"). *See* 2002 Plan Restatement at § 1.1. The Firstar Plan included the Mercantile Bancorporation, Inc. Retirement Plan (the "Mercantile Plan").

28.     The Old Cash Balance Plan and the Mercantile Plan are cash balance plans. *See* 2017 SPD at Attachments 1 and 3. The Firstar Plan was a traditional defined benefit pension plan whereby participants earned benefits in the form of an annuity based on their wages and the number of years they worked for Firstar before December 31, 2001. *See* SPD at Attachment 2; *see also* 2002 Plan Restatement at Appendix F.

29.     Beginning on January 1, 2002 for participants in the Old Cash Balance Plan and the Firstar Plan and beginning on January 1, 2003 for participants in the Mercantile Plan, the Plan changed its benefit accrual formula to the Final Average Pay Formula. *See* 2002 Plan Restatement at §§ 1.1, 1.2, 1.3 and 1.4. Under the Final Average Pay Formula, participants earn retirement benefits based on their final average pay and their years of service. *See* 2002 Plan Restatement at § 2.1.1.

30.     Effective November 15, 2009, participation in the Plan was frozen so that no new U.S. Bancorp employees became participants in the Plan. New employees became participants in the U.S. Bank 2010 Cash Balance Plan (the "2010 Cash Balance

Plan"), a component of the Plan. *See* 2010 Cash Balance Plan at § 1. Under the 2010 Cash Balance Plan, participants receive an annual pay credit to a hypothetical plan account and earn interest on those credits. *See* 2010 Cash Balance Plan at § 2.1.1. They did not accrue benefits under the Final Average Pay Formula.

31. Plan participants with accrued benefits under the Final Average Pay Formula could choose whether they would continue to accrue benefits under Final Pay Formula or begin accruing benefits under the 2010 Cash Balance Plan's formula effective January 1, 2010. 2017 SPD at 2. Plan participants that did not choose to participate in the 2010 Cash Balance Plan continued to accrue pension benefits under the Final Average Pay Formula while they were employed by U.S. Bancorp.

32. The Plan's benefits comprised of three parts: (a) the benefits accrued under either the Old Cash Balance Plan, the Firstar Plan or the Mercantile Plan, if applicable (the Plan's "A" benefit); (b) the benefits accrued under the Final Average Pay Formula (the Plan's "B" benefit); and (c) the benefits accrued under the 2010 Cash Balance Component, if applicable (the Plan's "C" benefit). Participants' retirement benefits under the Plan are equal to the sum of the benefits they accrued under the A, B, and C formulae.

**B.  Plan Terms Applicable to the Final Average Pay Formula.**

33. The Plan's Final Average Pay Formula provides retirement benefits that are "an important part of (participants') total compensation." See 2017 SPD at 2.

34. The Plan's normal form of benefit is a single life annuity (SLA) commencing at age 65, a payment stream that starts when participants retire and ends when they die. *See* 2002 Plan Restatement at § 5.2.3.

8

35.     The Plan offers many optional forms of benefits other than other than a SLA.  Married participants may select Joint and Survivor Annuities ("JSAs") that provide for annuities for the life of the participant and a percentage of that benefit for the life of the spouse.  The percentage of the participant's benefit available for the life of the spouse may be, for example, 50%, 75% or 100%.  *See* 2002 Restatement at § 6.1(c).

36.     Plan participants can start receiving their benefits after their employment with U.S. Bancorp ends and as early as age 55 if they have at least five years of service.  *See* SPD at 11, Plan Document at § 2.1.25.

37.     An early commencement factor, or "ECF," is applied to the benefits accrued under the Final Average Pay Formula when a participant retires before age 65.  The ECF is the percentage of the normal retirement benefit that the participant would receive if he or she waited until age 65 to start receiving benefits.  For example, an ECF of .90 means that a participant will receive 90% of the amount he or she would receive at age 65.

38.     The Plan prescribes the ECFs that apply to the benefits accrued under Final Average Pay Formula, as shown in the chart below.

| Age | Final Average Pay ECF | Age | Final Average Pay ECF |
|-----|-----------------------|-----|-----------------------|
| 64  | .90                   | 59  | .55                   |
| 63  | .81                   | 58  | .50                   |
| 62  | .73                   | 57  | .46                   |
| 61  | .66                   | 56  | .42                   |

| 60 | .60 | 55 | .38 |

*See* 2002 Plan Restatement at Appendix C, § 4; *see also* 2017 SPD at 11.

39.     For each month that the participant starts receiving benefits that follows an age (*e.g.*, 55), the ECF is increased by one-twelfth of the difference between the ECF of the participant's attained age and the factor at the participant's next highest age.  *See* 2017 SPD at 11.  For example, a participant who retires at 55 years and 6 months would have an ECF of .40.

## II.     The ECFs Applicable to the Final Average Pay Formula Are Unreasonable, Excessive and Result in an Illegal Forfeiture of Benefits under ERISA.

### A.     Calculating ECFs.

40.     When a participant in a defined benefit plan begins receiving a pension before the plan's normal retirement date, each monthly pension payment is reduced to account for the fact that the participant will receive benefits over a longer period, *e.g.*, from age 63 instead of age 65.   A participant who retires early is foregoing benefits later through a reduced benefit payment in exchange for starting the payment stream earlier.

41.     The amount that each payment is reduced is expressed as a percentage or decimal of the benefit the participant would receive at the plan's normal retirement date of age 65, and is called an ECF.

42.     An ECF should leave the participant *and* a defined benefit plan no worse off economically than if the participant waited until age 65 to begin receiving benefits.  ERISA

requires that a plan participant receive the "actuarial equivalent" of the accrued benefits payable at normal retirement age" ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

43. When calculating an ECF, reasonable actuarial assumptions must be used. *See* 26 C.F.R. § 1.401(a)-14(c)(2). An ECF is based on two actuarial assumptions: an interest rate and a mortality table.

44. An interest rate is used to determine the present value of each future payment that a participant will receive. The rate is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns. The rate used is often called a "discount rate" because it discounts the value of a future payment. The higher the interest rate, the lower the ECF.

45. The interest rate that a defined benefit plan uses to calculate ECFs should be based on prevailing market conditions and projections of future interest rates when the payments will be made. As such, the interest rate is commonly broken into segments of short-term, medium-term and long-term expectations that pertain to each future payment.

46. A mortality table predicts how many people at a given age will die before attaining the next higher age. More recent tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries, an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. New mortality tables were published in 1971, 1983, 1984 (the "UP 1984"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

11

47. Moreover, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality. For example, the RP-2014 mortality table is commonly projected by actuaries using a mortality improvement scale to account for additional reductions in mortality rates that have occurred since 2014.

48. Since the 1980s, the life expectancies in mortality tables have steadily improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014) at 1.

49. Older mortality assumptions (*i.e.*, those using a mortality table with higher probabilities of death at a given age) generate lower present values of future payments, and the amount of the monthly benefit decreases. The higher the mortality rate, the lower the ECF.

**B.    The ECFs Applicable to the Final Average Pay Formula Are Unreasonable.**

50.    The Plan does not specify how ECFs applicable for the Final Average Pay Formula were calculated.  *See* 2002 Plan Restatement at Appendix C.  It does not identify an interest rate or mortality table; instead it sets forth fixed ECFs, which have ***not changed*** since at least 2002 despite dramatic increases in longevity.  These ECFs are outdated, unreasonable and result in the illegal forfeiture of vested benefits under ERISA.

51.    There have been historically low interest rates during the Class Period. Pension plans and actuaries commonly use the interest rates of bonds to determine the present value of future pension payments.  Bonds with durations that match (or closely resemble) the projected future pension payments are used to calculate the present value of the future payments.  For example, the interest rate for a bond with a 20-year maturity is used to calculate the value of a pension payment expected to be made in 20 years.

52.    The FTSE (formerly Citi) Pension Liability Index is commonly used as a rate by pension plans to discount future pension liabilities.  It represents a single discount rate used to calculate the present value of future liabilities by discounting a pension plan's standardized set of liabilities, using AA zero coupon bonds.  From November, 2012 until November, 2018, the FTSE Pension Liability Index ranged from 3.48 percent to 4.95 percent.

53.    The Mercer Yield Curve is another common way that pension plans generate a discount rate to value future payments.  The Mercer Yield rate was 4.25 percent and 3.41

percent at the end of November 2018 and 2017, respectively, and at all times during the Class Period, was similar to that of the FTSE Pension Liability Index.

54. The "segment" interest rates prescribed by ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3) and Section 417(e)(3) of the Internal Revenue Code, 26 U.S.C. § 417(e)(3), to calculate the present value of a lump sum payment is another common way that a pension plan selects a discount rate. For example, the Plan uses the Section 417 interest rates to calculate many forms of benefits under the Plan. *See*, *e.g.*, 2002 Plan Restatement at Appendix C, § 3 (using § 417 interest rates to determine the lump sum value of annuity), 2010 Cash Balance Plan at § 2.1.22 (converting accrued benefit to single life annuity).

55. Like the FTSE Pension Liability Index, ERISA's "segment" rates provide an average interest rate for years 0-5 ("1st Segment"), years 5-19 ("2nd Segment") and years 20 and later ("3rd Segment") of a future benefit stream such as an annuity. 26 U.S.C. §§ 417(e)(3)(C) and (D). The rates for the 1st Segment, 2nd Segment and 3rd Segment in October, 2018 were 3.33 percent, 4.39 percent and 4.72 percent, respectively and have been relatively consistent throughout the Class Period.

56. Accordingly, throughout the Class Period, an interest rate of 4 percent would have been reasonable to use when calculating ECFs for the Plan's Final Average Pay Formula.

57. As alleged above, mortality rates have dramatically improved since the 1980s and have continued to improve during the Class Period. ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3) and Section 417(e)(3) of the Internal Revenue Code, 26 U.S.C. § 417(e)(3), prescribe a mortality table that must be used when calculating the lump sum value of an

annuity.  This regulation requires the use of the RP-2014 mortality table as updated under the mortality improvement scale to account for additional reductions in mortality rates that have occurred since 2014.

58.     The Plan correctly uses the mortality table prescribed by I.R.C. § 417(e)(3) to calculate numerous forms of benefits, including to calculate the maximum amount of benefits that a participant may receive in a given year (2002 Plan Restatement at § 1.1.1(a)) and to convert a participant's hypothetical account in the 2010 Cash Balance Plan to a single life annuity (2010 Cash Balance Plan at § 2.1.22).

59.     Accordingly, throughout the Class Period, the use of the mortality table prescribed by I.R.C. § 417(e) would have been ***reasonable*** to use when calculating ECFs for the Plan's Final Average Pay Formula.  Defendants easily could have done so.

60.     The ECFs generated when using a reasonable interest rate (*e.g.*, 4 percent) and a reasonable mortality table (*e.g.*, the one prescribed by I.R.C. § 417(e)), are substantially more favorable for participants than those that the Plan uses for the Final Average Pay Formula, as shown in the below chart and graph:

| Age | ECFs Using Current Interest Rates and Mortality Tables | Final Average Pay ECF | Difference |
|---|---|---|---|
| 55 | .4881 | .38 | 22% |
| 56 | .521 | .42 | 19% |
| 57 | .557 | .46 | 17% |
| 58 | .597 | .50 | 16% |

| | | | |
|---|---|---|---|
| 59 | .640 | .55 | 14% |
| 60 | .686 | .60 | 13% |
| 61 | .738 | .66 | 11% |
| 62 | .794 | .73 | 8% |
| 63 | .856 | .81 | 5% |
| 64 | .924 | .90 | 3% |



61.    At shown above, the ECFs that Defendants use for the Final Average Pay Formula are ***substantially lower*** (*i.e.*, worse for participants) than the ECFs that would be generated using reasonable interest and mortality rates as required by ERISA.

62.    Plaintiffs, and each member of the Class who retired before age 65 with accrued benefits under the Final Average Pay Formula, received a lower pension than they

were entitled to because of the excessive, unreasonable reductions that Defendants applied through the ECFs.  By using the unreasonable ECFs applicable to the Final Average Pay Formula instead of ECFs reflecting interest rate and mortality assumptions during the year Plaintiffs retired, Defendants caused Plaintiff Janet Smith's Final Average Pay Formula by *16%* each month, Plaintiff Debra Thorne's benefits by *6.6%* each month, Plaintiff Sonja Lindley's benefits by *22%* each month, and Plaintiff Pamela Kaberline's benefits by *12%* each month.

**III.    The ECFs For the Final Average Pay Formula Are Unreasonable Compared to Those Applicable to Other Plan Benefits.**

63.    The ECFs applicable to the Final Average Pay Formula are also substantially worse for participants than those applicable to ***other parts of the Plan***.

64.    For participants in the Firstar Plan who retire before age 65, the part "A" of their benefit is reduced by only 1/180 for each month between ages 60 and 65, or 6 and 2/3% each year.  Between ages 55 and 60, the part "A" benefit is reduced by only 1/360 for each month, or 3 and 1/3% per year.  *See* 2017 SPD at Attachment 2.  The ECFs for the Firstar Plan and difference between the Firstar ECFs and the Plan's ECFs are summarized in the table and graph below.

| Age | Firstar Plan's ECF | Final Average Pay ECF | Difference |
|-----|--------------------|-----------------------|------------|
| 55 | .5 | .38 | 24% |
| 56 | .534 | .42 | 21% |
| 57 | .567 | .46 | 19% |
| 58 | .60 | .50 | 17% |

| 59 | .633 | .55 | 13% |
| --- | --- | --- | --- |
| 60 | .666 | .60 | 10% |
| 61 | .733 | .66 | 10% |
| 62 | .80 | .73 | 9% |
| 63 | .866 | .81 | 6% |
| 64 | .933 | .90 | 3% |



65. The calculation of Plaintiff Thorne's benefits illustrates the

*unreasonableness* of the Final Average Pay Formula's ECFs in relation to the Firstar

Plan.  Plaintiff Thorne was a fully vested participant, accruing benefits in the Firstar Plan

and under the Final Average Pay Formula.  When she retired at age 62 years, 11 months,

Defendants applied an ECF of .8611 to her benefits under the Firstar Plan but an ECF of

only .80330 to the benefits she accrued under the Final Average Pay Formula. Thus, Ms. Thorne's benefits under the Final Average Pay Formula were **6.7% less** than they would have been if the Defendants applied the Firstar Plan's ECFs, which are reasonable under ERISA and which would not have resulted in Plaintiff Thorne illegally forfeiting her benefits. Defendants easily could have applied the Firstar ECFs as the Final Average Pay ECF.

66.     The ECFs under the Final Average Pay Formula are also **substantially worse** for participants than those under the 2010 Cash Balance Plan. Under the 2010 Cash Balance Plan, U.S. Bancorp credits a percentage of the participant's wages each year to a hypothetical account, with balances accruing interest each year. *See* 2002 Plan Restatement at Appendix I, § 2.1.1. The 2010 Cash Balance Plan's normal form of benefit is a single life annuity. *See* 2002 Plan Restatement at Appendix I, § 5.1.3. To convert the participant's cash balance account to an annuity, Defendants use an interest rate and a mortality table.

67.     If a participant in the 2010 Cash Balance Plan retires before age 65, the interest rate that is applied is the greater of: (a) the annual interest rate on 10-year Treasury Securities during the previous October; or (b) 3 percent. *See* 2002 Plan Restatement at Appendix I, § 5.1.3. During each October during the Class Period, the annual interest rate on the 10-year Treasury Securities has been less than 3 percent.[1]

---

[1] The historical rates of return on 10-year Treasury notes are provided on www.treasury.gov, with each year have its own webpage. *See*, *e.g.*, https://www.treasury.gov/resource-center/data-chart-center/interest-

Accordingly, the 3 percent interest rate has applied when calculating ECFs for the 2010 Cash Balance Plan since January 1, 2010. The mortality table used to calculate the ECFs for the 2010 Cash Balance Plan is the "mortality table prescribed under § 417(e)(3)(B) of the Internal Revenue Code." 2002 Plan Restatement at Appendix I, § 2.1.22.

68. The ECFs for the 2010 Cash Balance and the Final Average Pay Formula, and the difference between the two, are summarized in the table and graph below.

| Age | 2010 Cash Balance Plan's ECF | Final Average Pay ECF | Difference |
|-----|------------------------------|------------------------|------------|
| 55 | .5618 | .38 | 32% |
| 56 | .5917 | .42 | 29% |
| 57 | .6239 | .46 | 26% |
| 58 | .6586 | .50 | 24% |
| 59 | .6960 | .55 | 21% |
| 60 | .7366 | .60 | 19% |
| 61 | .7806 | .66 | 15% |
| 62 | .8284 | .73 | 12% |
| 63 | .8806 | .81 | 8% |
| 64 | .9376 | .90 | 4% |

---

rates/Pages/TextView.aspx?data=yieldYear&year=2015 (last visited December 10, 2018).



69.    The ECFs applicable to the 2010 Cash Balance Plan were adopted effective January 1, 2010.  *See* 2002 Plan Restatement at Appendix I, § 2.1.22.  Defendants could have easily applied the Cash Balance Plan's ECFs to the Final Average Pay Formula.

## IV.    The Plan Uses Reasonable Actuarial Assumptions to Calculate Other Forms of Benefits.

70.    The ECFs applicable to the Final Average Pay Formula are also unreasonable and excessive, considering the actuarial assumptions that Defendants use to calculate other forms of benefits.

71.    Under the Final Average Pay Formula, participants accrue benefits in the form of a SLA.  *See* 2002 Plan Restatement at § 5.1.3.  Married participants can choose to receive their benefits in the form of a joint and survivor annuity ("JSA") which provides for an annuity for the life of the first spouse to pass away and a percentage of

that benefit for the life of the surviving spouse. That percentage may be 50%, 75% or 100%. 2002 Restatement at § 6.1(c).

72.     Like it does for early retirement benefits, ERISA requires that a JSA be the "actuarial equivalent" of a SLA for the life of the participant. ERISA §§ 205(d)(1)(B) and (d)(2)(A), 29 U.S.C. §§ 1055(d)(1)(B) and (d)(2)(A); *see also* 26 C.F.R. § 1.401(a)-20 Q&A 16 (A JSA "must be as least as valuable as any other optional form of benefit under the plan at the same time."). Accordingly, the present value of the JSA must equal a SLA's present value.

73.     The Plan provides that a participant who elects a 50% JSA will receive .92 of the benefit they would have received as an SLA. *See* 2002 Plan Restatement at Appendix C, § 2. This means that a participant who is entitled to a SLA of $1,000 a month will receive $920 a month for the rest of his or her life, with his or her surviving spouse receiving $460 a month after the participant's death. The .92 factor that applies to the 50% JSA is called the "annuity factor." Under the Plan, an annuity factor of .89 applies to the 75% JSA and a .86 annuity factor applies to the 100% JSA.

74.     While the Plan does not state which interest rate or mortality table are used to generate the applicable annuity factors, the annuity factors are the same as those that would be generated using the interest rates and mortality table under I.R.C. § 417(e). When calculating the "actuarial equivalence" of a JSA, Defendants use current, reasonable actuarial assumptions to calculate optional forms of benefit. But when calculating the "actuarial equivalence" of early retirement benefits under the Final Average Pay Formula, Defendants use different assumptions, which are substantially

worse for participants. Assumptions that are the "actuarial equivalence" for the JSA

under ERISA § 205(d)(1)(B) and (d)(2)(A), 29 U.S.C. § 1055(d)(1)(B) and (d)(2)(A),

should be actuarially equivalent for early retirement benefits under ERISA § 204(c)(3),

29 U.S.C. § 1054(c)(3), because both use the same statutory language.

75. The Plan also permits participants who are receiving their benefits as an

annuity to roll over their accounts in the U.S. Bancorp 401(k) Savings Plan in order to

purchase an annuity. *See* 2002 Plan Restatement at § 6.5. When converting participants'

401(k) balances to an annuity, the Plan provides that the interest rates and mortality

assumptions in I.R.C. § 417(e) will apply. *See* 2002 Plan Restatement at § 6.5.

76. When determining the maximum permissible benefit that a participant may

receive, the Plan also uses a 5 percent interest rate and the mortality table in I.R.C. §

417(e). *See* 2002 Plan Restatement at Appendix A, § 1.1.

## CLASS ACTION ALLEGATIONS

77. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined as

follows:

> All participants in and beneficiaries of the Plan who accrued
> benefits under the Final Average Pay Formula who began
> receiving their vested benefits before age 65. Excluded from
> the Class are Defendants and any individuals who are
> subsequently to be determined to be fiduciaries of the Plan.

78. The members of the Class are so numerous that joinder of all members is

impractical. Upon information and belief, the Class includes thousands of persons. There

are over 54,000 active participants in the Plan and more than 20,000 participants who are

retired and receiving benefits. According to the Plan's most recent Form 5500 filed with the Department of Labor in October, 2018, participants, on average, begin receiving their pension benefits under the Plan at age 63. *See* 2017 Form 5500 at Schedule SB Attachment.

79. Plaintiffs' claims are typical of the claims of the members of the Class because they arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

80. There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A. Whether the ECFs applicable to the Final Average Pay Formula cause participants to illegally forfeit their vested benefits;
>
> B. Whether the actuarial assumptions used to generate the ECFs applicable to the Final Average Pay Formula are reasonable;
>
> C. Whether the Plan should be reformed to comply with ERISA; and
>
> D. Whether Plaintiffs and Class members should receive additional benefits.

81. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

82. This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

83. In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

84. In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

85. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

86. The Plan improperly reduces benefits under the Final Average Pay Formula by using ECFs that are based on unreasonable actuarial assumptions. Participants who accrued a benefit under the Final Average Pay Formula who retire before age 65 receive a benefit that is significantly less than that they would be entitled to at the Plan's normal retirement age of 65 in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

87. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

88. Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the ECFs applied to the Final Average Pay Formula do not provide an equivalent benefit to that which they would receive at the Plan's normal retirement age and are not based on reasonable actuarial assumptions. By reducing benefits in excess of what is reasonable to account for participants' early retirement, Defendants have violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

89. Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a) re-calculation and correction of benefits previously paid using the Final Average Pay Formula's ECFs;

(b) an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**For Reformation of the Plans and Recovery of Benefits Under the Reformed Plans**
**(ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1))**

90.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

91.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

92.     The Plan improperly reduces vested benefits under the Final Average Pay Formula for participants who begin receiving their benefits before age 65. By not providing participants and beneficiaries with a benefit that is equivalent to the Plan's normal retirement benefit, Defendants have violated ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), and ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

93.     Plaintiffs are entitled to reformation of the Plan to require them to provide an early retirement benefit that is actuarially equivalent to the normal retirement benefit.

94.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

95.     Plaintiffs seek to recover actuarially equivalent benefits, to enforce their right to the payment of past and future actuarially equivalent benefits, and to clarify their rights to future actuarially equivalent benefits, under the Plan following reformation.

### THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

96.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

97.     The Committee, and each member of the Committee, are named fiduciaries of the Plan and its participants and beneficiaries.

98.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility

to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

99. The Committee and each member of the Committee are fiduciaries for the Plan and its participants and beneficiaries because they exercised discretionary authority or discretionary control respecting management of such plan or exercised any authority or control respecting management or disposition of Plan assets. In particular, they had authority or control over the amount and payment of benefits paid when a participant with vested benefits under the Final Average Pay Formula retired before age 65.

100. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plans are consistent with ERISA.

101. The Plan is not consistent with ERISA because the ECFs applicable to the Final Average Pay Formula result in a forfeiture of benefits in violation of ERISA §§ 203 and 204, 29 U.S.C. §§ 1053 and 1054.

102. In following the Plan's terms that violated ERISA, the Committee and its members exercised their fiduciary duties and control over the Plan and Plan assets.

103. In following the terms of the Plan in violation of ERISA, the Committee and its members breached their fiduciary duties.

104.    ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. U.S. Bank appointed the Committee. In allowing the Committee to pay unreasonably low benefits in violation of ERISA, U.S. Bank breached its fiduciary duties to supervise and monitor the Committee.

105.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

106.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the ECFs applicable to the Final Average Pay Formula violate ERISA because they do not provide an actuarially equivalent benefit to what the participant would receive at the Plan's normal retirement age, 65.

107.    Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a)    re-calculation and correction of benefits previously paid under the Final Average Pay Formula's ECFs;

(b)    an "accounting" of all prior benefits and payments;

(c)    a surcharge;

(d)    disgorgement of amounts wrongfully withheld;

30

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     Certifying this action as a class pursuant to FED. R. CIV. P. 23;

B.     Declaring that the Plan fails to properly calculate and pay retirement benefits for participants with vested benefits under the Final Average Pay Formula who retire before age 65;

C.     Ordering Defendants to bring the Plans into compliance with ERISA, including, but not limited to, reforming the Plan to bring it into compliance with ERISA with respect to the ECFs for the Final Average Pay Formula;

D.     Ordering Defendants to correct and recalculate benefits that have been paid;

E.     Ordering Defendants to provide an "accounting" of all prior payments of benefits under the Plan to determine the proper amounts that should have been paid;

F.     Ordering U.S. Bancorp to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.     Ordering U.S. Bancorp to disgorge any profits earned on amounts improperly withheld;

H.    Imposition of a constructive trust;

I.    Imposition of an equitable lien;

J.    Reformation of the Plan;

K.    Ordering Defendants to pay future benefits in accordance with ERISA;

L.    Ordering Defendants to pay future benefits in accordance with the terms of the Plan, as reformed.

M.    Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate equitable relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

N.    Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.    Any other relief the Court determines is just and proper.

Dated:  December 14, 2018            Respectfully submitted,

 *s/Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
Amanda M. Williams (#341691)
**GUSTAFSON GLUEK LLP**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
Facsimile: 612-339-6622
Email:  dgustafson@gustafsongluek.com
Email:  awilliams@gustafsongluek.com

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (*pro hac vice* forthcoming)
Mark P. Kindall (*pro hac vice* forthcoming)
Douglas Needham (*pro hac vice* forthcoming)
Seth R. Klein (*pro hac vice* forthcoming)
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: 860-493-6292
Facsimile: 860-493-6290
Email: rizard@ikrlaw.com
Email: mkindall@ikrlaw.com
Email: dneedham@ikrlaw.com
Email: sklein@ikrlaw.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (*pro hac vice* forthcoming)
Mark G. Boyko (*pro hac vice* forthcoming)
1054 31st Street, NW, Suite 230
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
Email: gporter@baileyglasser.com
Email: mboyko@baileyglasser.com

*Attorneys for Plaintiffs*